MUNSON LINE, Inc., v. VERVLIET.
THE RUBENS.

No. 15854.

District Court, E. D. New York.

Feb. 3, 1941.

Irving L. Evans, of New York City, for libellant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Joseph F. Luley, of New York City, of counsel), for respondents.

CAMPBELL, District Judge.

This suit was brought by libellant in admiralty to recover in personam from Henri Vervliet, a subject of the King of the Belgians, the purchaser of the American Motor Vessel Munmotor, the name of which was later changed to Rubens, and in rem against the said Motor Vessel Rubens, formerly Munmotor, etc., to recover the sum of about $2,800, the alleged aggregate value of the following items, with interest and costs:

1. For fuel oil, unbroached stores, supplies, etc., alleged to have been on board the said vessel when title was transferred to respondent, which were not included in the purchase price of the vessel.

2. For the alleged balance of the expense of shifting the vessel from Providence to New York at the request of the respondent, so as to transfer title to and possession of the ship at the latter port, instead of the former as had been originally agreed.

3. For alleged marine insurance premiums and the cost of extending libellant's marine insurance to protect the interest of respondent in the ship pending the transfer of title and until the owner could place his regular insurance.

At the opening of the trial the libellant withdrew the suit in rem against the Motor Vessel Rubens, formerly the Munmotor, and the trial proceeded only upon the suit in personam against the respondent Henri Vervliet.

The $125,000 agreed to be paid for the vessel, was paid, and is not in question here.

At the outset it may be well to dispose of the respondent's attempt to interject, by way of separate defense in this suit, the alleged contract of January 9th, 1940, between Eliot or Eliot Export Corporation and the respondent Vervliet.

Neither Eliot or the Eliot Export Corporation had any claim or title legal or equitable to the Motor Vessel Munmotor, nor did it have any legal and binding agreement for the purchase of that vessel at that date, or at any time with which we have any concern, and any agreement made by Eliot or Eliot Export Corporation to sell the said vessel to the respondent Vervliet, if there was such agree-

ment, was simply an agreement by Eliot or Eliot Export Corporation to sell something he or it did not own, and as to which he or it had no claim, or title legal or equitable, but was merely capitalizing hope, and the libellant herein is in no way bound by any such alleged contract. I allowed much evidence oral and documentary to be offered with reference to the alleged agreement by Eliot or the Eliot Export Corporation to sell the said vessel to the respondent Vervliet, and the alleged surrounding circumstances on the theory that they were to be connected up to bind the libellant, but they were not, and, therefore, such evidence, oral and documentary, requires no further consideration, and will be disregarded.

The respondent was very anxious to obtain the vessel if he could change her registry and flag from that of the United States of America to that of the Kingdom of Belgium.

During the latter part of January, and the first half of February, 1940, negotiations for the purchase of the vessel from the libellant for $125,000 were carried on by Eliot or Eliot Export Corporation claiming to be acting as agent for the respondent Henri Vervliet, the libellant being represented in these negotiations from February 1st, 1940, to February 10th, 1940, by its secretary, Irving L. Evans, Esq., who is its proctor in this suit. These negotiations had proceeded to a point where a proposed agreement to sell had been drawn to sell the vessel to the respondent, being represented by Eliot or Eliot Export Corporation as agent, but the authority of Eliot or Eliot Export Corporation to purchase said vessel and sign application to Maritime Commission as the agent for the respondent, not being shown to the satisfaction of the libellant, steps were taken by Eliot or Eliot Export Corporation and Captain Robin, who had been sent from Belgium to take command of the vessel, to meet this objection.

A conversation was had by long distance telephone at which Mr. John D. Hyde was present between New York and Antwerp, Belgium, in which Mr. Eliot, Captain Robin in New York, Mr. Vervliet, and a Mr. Gordon in Antwerp participated. Those in New York spoke English, those on the other side, French.

As a result a cablegram was received by the said John D. Hyde, reading as follows:

"1940 Feb. 13 P.M. 11 22
"Western Union Cablegram
"B 1184 As Antwerp 70 14
"Nlt Lawyer John Hyde
"Broadstreet 15 or 150 New York
"I hereby appoint John D. Hyde my power of attorney with full power and authority to represent me and sign on my behalf as purchaser of vessel Munmotor all necessary documents in order to vest to me title to vessel Munmotor free of charter changes indebtedness mortgage liens encumbrances and legally transferred to Belgian flag
"Henri Vervliet  31 Rempart
"Ste Catherine"

Captain Robin, the Belgian master, sent over by the respondent to take command of the ship, was in communication with Mr. Hyde, and Mr. Vervliet, also Mr. Evans, and was informed as to the conditions of sale and saw and read the proposed agreement before it was signed, and I am convinced informed his principal, the respondent, as to the terms of the proposed agreement.

On February 15th, 1940, the said John D. Hyde, as attorney in fact of the respondent, signed the agreement of sale, Exhibit 1.

The Motor Vessel Munmotor had been under charter expiring in May, 1940, and some time had been consumed in securing a release which libellant had accomplished.

At the time of signing the agreement said John D. Hyde also signed the application to the Maritime Commission as attorney in fact of the respondent, for leave to sell the Munmotor to the respondent and to transfer her to Belgian registry, and flag, Ex. 2.

The ship was to be delivered at Providence, R. I.

On February 23rd, 1940, the day the Maritime Commission approved the sale of the vessel to the respondent herein, and her transfer to Belgian registry and flag, the said John D. Hyde, as attorney in fact of respondent, while at Washington, D. C., because of lack of dry dock facilities at Providence requested the libellant in writing to change the port of delivery of the Munmotor, from Providence to the port of New York, and offered and agreed, as such attorney in fact, to pay the expenses of transferring the vessel from Providence to the port of New York, Exhibit 3.

Libellant, in consideration of said offer, directed the master of the Munmotor to bring her to New York, where she arrived and anchored at Red Hook Flats the following morning, shortly after ten o'clock.

Under the agreement of February 15th, 1940, all unbroached deck, engine room, and stewards stores, new rope and all lubricating oil and fuel oil not in use and all fresh water and fuel oil on board at the time of delivery of the vessel was to be agreed upon as to quantity and to be taken and paid for by the respondent at the current market price therefor at the time and place of delivery.

Libellant had checked the stores, etc., while the vessel was at Providence.

On behalf of respondent no check had been made.

The vessel was to be paid for by letter of credit.

No check having been made on behalf of the respondent, libellant refused to transfer the vessel unless and until the supplies were paid for by certified check, as agreed.

With the desire for speed in obtaining possession of the vessel on the part of the respondent, Mr. Hyde, his attorney in fact, asked Mr. Evans, the secretary of libellant, if there was any arrangement by which it could be done, and it was agreed that the libellant would proceed with the transfer if it was understood that the libellant should and would have a maritime lien for the fuel oil, supplies, stores, etc., on board, including the insurance premiums for the insurance which had been placed or extended on account of the respondent, upon the condition that the stores be checked the following day and the amounts agreed upon and the prices fixed. That was agreed to by Mr. Hyde, the attorney in fact of the respondent, who also agreed that in any event, whether a lien existed under the law or not, Mr. Vervliet, for whom he was acting, should and would be responsible for the amount of the fuel and other obligations referred to. The agreement, last referred to, was an oral, not a written, agreement.

The sale was completed, the vessel turned over to the representative of the respondent, the letter of credit for $125,000 paid to libellant by crediting it to libellant's account in the bank. The bill of sale, Exhibit 4, in which there was no reservation as to said claims of libellant here made, and all of the papers required under the letter of credit were turned over to the bank, including the statement.

Among the papers required to accompany the bill of sale under the letter of credit was a written declaration by libellant, stipulating that the boat is free of any obligations, whatsoever, against others.

Such a written declaration was delivered.

The vessel was turned over to respondent, and all ships papers belonging to the boat were turned over to Captain Robin, the respondent's Belgian captain, who receipted for the same.

By clause 11 of the agreement of sale, dated February 15th, 1940, it was provided that the respondent should pay for the extension of libellant's P. & I. and hull, machinery, etc., insurance policies on the vessel expiring February 21st and 24th, 1940, respectively, up to the time of the delivery of said vessel or for such delivery of said vessel or for such minimum time as the underwriters would cover, at the best obtainable rate through sellers brokers.

Later, Mr. Hyde, as attorney in fact of the respondent, requested verbally that when such insurance was extended or renewed by Munson Line, Incorporated, the name of Mr. Vervliet (the respondent) be included as an assured, so as to protect his interest in the vessel, pending regular insurance being placed by the new owner.

▉ Respondent's first contention is, that there is no jurisdiction of the instant suit in admiralty, and bases that contention largely upon the fact that the agreement was for the sale of a ship, which is not cognizable in admiralty, and libellant answers that by the contention that a Court of Admiralty has jurisdiction of an action which is maritime only in part, but it does not seem to me to be necessary to discuss jurisdiction from that standpoint, because as I will afterward show, I find that the agreements made by Mr. Hyde, as attorney in fact of the respondent, were new agreements, and did not, except the one for bringing the vessel from Providence to New York, become effective until after the sale was consummated and the vessel turned over to the respondent.

They resulted from the great desire of the respondent to get possession of the vessel at the earliest time possible.

The request made of libellant to bring the ship from Providence to New York, by

the attorney in fact of the respondent, and the promise to pay the expenses made in writing by the attorney in fact of the respondent, was certainly a cause of which this court had jurisdiction in admiralty.

The agreement, to pay for stores and oil, etc., left aboard the vessel on the request and agreement to pay therefor after the delivery of the vessel, made by the attorney in fact of the respondent, was a cause of which this court in admiralty had jurisdiction.

The agreement to pay insurance premiums is not so clearly a cause of maritime jurisdiction as the other causes, to which I have referred, but I think respondent is in error in contending that the contract on which the libellant is seeking to recover was akin to a contract to procure insurance upon a cargo, which was held to be non-maritime in United Fruit Co. v. United States Shipping Board Merchant Fleet Corporation, D.C., 42 F.2d 222.

See, also, The Wabash, D.C., 279 F. 921; The Prilla, D.C., 21 F.Supp. 383; and also Cory Bros. & Co. v. United States, 2 Cir., 51 F.2d 1010, 1012, in which the distinction between preliminary services leading to a maritime contract and such contracts is pointed out.

It seems to me that the decision in El Amigo, 5 Cir., 285 F. 868, certiorari denied, 262 U.S. 751, 43 S.Ct. 700, 67 L.Ed. 1215, in which it was agreed that the premiums of accident insurance was included in the contract price of stevedoring service, is in point.

The libellant was not a broker to procure insurance, but the owner of the vessel covered by the insurance policies, which would expire before the sale of the vessel could be consummated, and the vessel turned over to respondent, and in addition to protect the interest of the respondent, at the request of the attorney in fact of the respondent, the libellant had an endorsement made on those policies to that effect, and it is not for procuring such policies that libellant seeks to recover herein, but for the premiums actually paid at the request of the respondent, by his attorney in fact. This agreement, it seems to me, is so closely connected to the vessel itself, that it is a cause of which admiralty has jurisdiction.

This court has jurisdiction of this case in admiralty.

Respondent's next contention is that libellant is estopped by its own sealed instrument from advancing these claims.

That might well be, if the claims were made under the agreement of sale, as the agreement of sale would be merged in the bill of sale, and libellant would not be allowed to vary and modify an agreement in writing by parole evidence.

It is true that in and by paragraph 6 of the agreement, libellant agreed to deliver with the vessel all unbroached deck and engine room and steward's stores, new rope, water, fuel oil, etc., and the respondent agreed to pay for the same by certified check.

It is also true that by paragraph 11 of the agreement of sale, the respondent agreed to pay for the extension of the seller's present P. & I. and hull, machinery, etc., policies of insurance, which expired February 21st and 24th, 1940, respectively, up to the time of delivery or such minimum time as the underwriters will cover at the best obtainable rates through seller's brokers. Subsequent to the making of the agreement of sale on the request of the attorney in fact of the respondent, the endorsement in favor of the respondent was made, and this was not provided for in the agreement of sale.

Under paragraph 7 of the agreement of sale the vessel was to be tendered to the buyer at Providence, Rhode Island. No provision is found anywhere in the agreement of sale for a change of the place of delivery, but at the written request of the attorney in fact of the respondent, because of the anxiety of the respondent to obtain possession of, and speedily put into use, the vessel, and his written agreement to pay the expenses, the vessel was brought by the libellant to the port of New York, arriving shortly before the time of delivery, and most of the expenses have been paid; a comparatively small balance remaining unpaid.

Although requested by the libellant, the stores were not checked before the turning over of the vessel, and delay would have been caused if libellant had insisted on the respondent checking up, and being paid before turning over the vessel.

Under the letter of credit an amendment of it would have been required if the agreement of sale were to be modified, or changed, as to the time of payment for the items in question, therefore, it was

agreed to go on and close the sale, the libellant waived its right of payment for the items in question under the agreement of sale before the delivery of the vessel, and accepted the promise of the respondent, by his attorney in fact, to pay after the delivery of the vessel.

No recovery could be had under the agreement of sale.

That the agreement to pay after the delivery of the vessel was a new promise is clearly shown by the fact that it was agreed that the libellant should and would have a maritime lien for the items, and in any event, whether a lien existed under the law or not, the respondent would be responsible for the amounts.

Whether the libellant could have a lien or not, which need not be discussed as libellant has withdrawn the proceeding in rem against the vessel, it is clear that libellant could not have a lien against the vessel, of which it was the owner, or claim against itself, and could not have a lien against the vessel or a claim against the respondent until after he came into possession of the vessel under the bill of sale to be given by the libellant. Therefore, the agreement was a new promise and not an amendment or modification of the agreement of sale which was executed by the bill of sale.

As a new promise it is enforcible.

█ Respondent also urges that by the declaration required of, and made by, the libellant, stipulating that the boat is free of any obligations whatsoever against others, the libellant estopped itself from enforcing the said verbal agreement. That contention can not be sustained; first, because the stipulation relates to obligations from the libellant to others, and the libellant could not have a lien against its own vessel, nor could it have any obligation against itself, and under the oral agreement it could not have any lien against the vessel or claim against respondent on his oral promise to pay, until after the vessel had been conveyed to the respondent.

█ The respondent's contention that all alleged prior agreements, both oral and written, were merged in the subsequent and formal instrument of title, does not seem to me to require further consideration, for the reason that, assuming that to be a correct statement of the law, there is no attempt here to amend or modify the agreement of sale or the bill of sale, or to recover under the agreement of sale, but simply to recover under an agreement which would not be effective until after the bill of sale had been delivered and, therefore, was not merged in the bill of sale.

This brings us to a consideration of the respondent's contention that Mr. Hyde was not authorized to make the agreement of sale, or the agreements as to the items in question, and that the libellant should have known that.

The difficulty with the defense in this suit is, as I said many times on the trial, that respondent was either attempting to litigate the matter of the attempted sale of the vessel to respondent on January 9th, 1940, by the Eliot Export Corporation, which corporation did not then have, and never did acquire any title legal or equitable to said vessel, and also the conduct of the bank as to the letter of credit, or the dealings of the Eliot Export Corporation, or the broker Paine with certain officers of the libellant who did not bind, and never had authority to bind the libellant with reference to any sale on January 9th, 1940. or to securing evidence as to those matters.

Sufficient to say that all matters with reference to the attempted sale by Eliot or Eliot Export Corporation are eliminated, as they have no place in this litigation; likewise it is no concern of the libellant what differences there may be, if any, between the respondent and the bank; and this likewise, should be eliminated.

Respondent sent over Captain Robin to take possession of the ship when delivered, and with her registry and flag changed from American to Belgian, to take command of the vessel. Captain Robin was not sent here to make decisions, but to inquire and report to respondent the cause of the delay.

Libellant refused to have anything to do with the attempt of Eliot or Eliot Export Corporation to sell what it did not own, and libellant insisted to the Eliot Export Corporation on selling only on its own terms and prepared the agreement to sell, which it exhibited to Captain Robin on February 13th, 1940, and allowed him to read, and informed him that it would not sell on any other terms. Captain Robin was in communication with the respondent during this time. There is no evidence that the respondent did not know the price and conditions under which alone the libellant

would sell, on the contrary, there is every reason to believe that Captain Robin kept his word to the secretary of the libellant, and informed respondent thereof.

On February 10th, 1940, libellant prepared for execution a bill of sale with the same terms and conditions to be executed by Eliot Export Corporation as the agent of respondent, but it was found that the Eliot Export Corporation could not produce sufficient evidence of authority to execute on behalf, of the respondent, or to make application for change of registry. This led to the telephone conversation of February 13th, at which Mr. John D. Hyde was present, between Mr. Eliot and Captain Robin in New York, and Mr. Vervliet the respondent and Mr. Gordon in Antwerp, Belgium.

Those in New York spoke English and respondent in Antwerp spoke French, and as Mr. John D. Hyde did not speak French he had to depend on translations.

There is no evidence that in that conversation there was any suggestion that the sale was to be under the conditions of the attempted sale of January 9th, 1940, on the contrary, it was made clear that some one must be vested with authority to represent the respondent.

This resulted in the sending of the cablegram, power of attorney, Exhibit 14, by the respondent, to the said John D. Hyde, which has hereinbefore been quoted in full.

The evidence shows that Captain Robin was, from February 2nd or 3rd, 1940, until the delivery of the vessel by libellant to respondent, in touch with the secretary of the libellant, the respondent and Mr. John D. Hyde, and was fully apprised of all that was done, and was urging haste in the delivery of the vessel.

■ The power of attorney was amply sufficient to clothe him with power on behalf of the respondent to execute the agreement of sale of February 15th, 1940, Exhibit 1, and the attempt of the respondent to change the terms of that agreement by a cablegram subsequent to its execution, of which the libellant never had information or knowledge, is no evidence of lack of authority of Mr. Hyde, as attorney in fact of the respondent, to execute the agreement of sale, or the agreements, in question.

■ The desire for speed on the part of the respondent as reflected by the actions of Captain Robin, still continued, and it was discovered that time could be saved by moving the vessel from Providence to New York, and Mr. Hyde, as the attorney in fact of the respondent, requested the removal of the vessel to New York, and agreed to pay the expense.

That was completely ratified by the payment of $600 on account, and was clearly in accord with the respondent's desire for speed.

■ As to the agreement to pay the cost of insurance, it seems to me to have been clearly within the duty and power of the attorney in fact to protect the respondent's interest by having his interest protected by insurance, in fact, a failure to do so would have been a grievous fault on the part of the attorney in fact of the respondent.

Again the respondent was interested in the speedy transfer of the vessel to him, and if the libellant had insisted on its right to a check-up of the stores, and payment, before the delivery of the vessel, a delay would have been occasioned had the libellant not consented to complete the sale and accept a new promise of the respondent to pay after he had obtained possession of the vessel.

No greater sum was required to be paid and the desire of the respondent to speedily obtain possession of the vessel was accomplished. This was clearly covered by the power of attorney.

■ Respondent's direction to Mr. Hyde by radiogram, dated March 5th, 1940, to turn over the papers to Captain Robin, was, in my opinion, a ratification of the acts of the attorney in fact, who in my judgment faithfully carried out the wishes of the respondent.

■ There is no evidence to show that Captain Robin was at the time of the trial employed by the respondent, or could have been produced by him, therefore, I cannot find that failure to take his testimony by deposition when it might well have been believed that he could be produced on the trial is sufficient to create the presumption that his testimony, if taken, would have been unfavorable to respondent.

■ I allowed the introduction of much evidence, oral and documentary, offered on behalf of the respondent, the materiality of which was not apparent, on the theory that it would be connected with the issues

in the suit at bar, particularly in limiting the authority of the attorney in fact of the respondent, under the power of attorney of February 13th, 1940, and the bringing home to the libellant of knowledge thereof. That was not done and the motion of the libellant to strike out the following evidence oral and documentary on the grounds that they are incompetent, immaterial and irrelevant, is granted:

The entire testimony of William E. Paine, Tr. 132 to 176, both inclusive, Exhibits A, C, and R.

The entire testimony of Rene Gordon from the bottom of Tr. 175 to 200, both inclusive, and the following Exhibits S, U, and V.

Exhibit 11.

Exhibit 17–A.

The entire testimony of James F. Waples, Tr. 263 to 267, both inclusive, and Exhibit AA.

All of the motions made by the respondent at the close of the whole case are denied with an exception as to each denial.

A decree may be entered in favor of the libellant against the respondent with costs and the usual order of reference.

Settle decree on notice, and submit proposed findings of fact and conclusions of law in accordance with this opinion.